976 F.2d 834
 FRANK L. CIMINELLI CONSTRUCTION CO., INC., Plaintiff-Appellant,
v.
BUFFALO LABORERS SUPPLEMENTAL UNEMPLOYMENT BENEFIT FUND,
Buffalo Laborers Pension Fund, Buffalo Laborers
Welfare Funds, and Buffalo Laborers
Training Fund, Defendants-Appellees.
 No. 1501, Docket 92-7163.
 United States Court of Appeals,
Second Circuit.
 Argued May 14, 1992.
Decided Oct. 5, 1992.
 
 Thomas S. Gill, Saperston & Day, P.C., Buffalo, N.Y., for plaintiff-appellant.
 Robert L. Boreanaz, Boreanaz Carra, & Boreanaz, Buffalo, N.Y., for defendants-appellees.
 Before: CARDAMONE, WINTER and MAHONEY, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal raises questions concerning when pension funds must repay an employer for overpayments. Appellant Frank L. Ciminelli Construction Co. ("Ciminelli") mistakenly made excess contributions to various employee pension and benefit funds and seeks to recover $32,326. The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1103 (1988), permits the repayment of overpayments within six months after the plan's determination of the overpayment. We have held that a fund's refusal to repay mistaken contributions within that six-month period may be challenged on the ground that it was arbitrary or capricious. Dumac Forestry Serv. v. International Bhd. of Elec. Workers, 814 F.2d 79, 82 (2d Cir.1987). Ciminelli, which had ample opportunity for discovery of the funds' administrators, has failed to meet this standard. We therefore affirm.
 
 
 2
 Although the record is sparse, the facts are undisputed. Ciminelli is a member of the Construction Industry Employers Association, Inc., a multi-employer bargaining group. In 1981 and 1984, the group entered into collective bargaining agreements with Laborers International Union of North America, Local Union No. 210. Under the agreements, employees who worked overtime earned 150% of normal wages but only 100% of normal fringe benefit contributions. From June 1981 to November 1986, Ciminelli mistakenly made fringe benefit contributions of the overtime hours paid rather than hours worked. This mistake caused Ciminelli to make overpayments in the amount of $32,326 to the Buffalo Laborers Supplemental Unemployment Benefit Fund, the Buffalo Laborers Pension Fund, the Buffalo Laborers Welfare Fund, and the Buffalo Laborers Training Fund (the "funds"). Ciminelli brought the overpayments to the funds' attention sometime after November 1986, and an audit commissioned by the funds and dated September 1987 confirmed the overpayments.
 
 
 3
 In December 1990, Ciminelli brought the instant action against the funds, asserting a right of equitable restitution to recover the overpayments. Ciminelli moved for summary judgment. In support of its motion, Ciminelli submitted affidavits and other papers establishing the fact of overpayment. The funds cross-moved for summary judgment, asserting that Ciminelli had no standing to sue. Although it could have done so, Ciminelli chose not to amplify its evidentiary submission.
 
 
 4
 Judge Elfvin granted summary judgment for the funds based on Dumac. Because Ciminelli's evidentiary submission did not address the balance of equities or the effect of repayment on the stability of the funds as required by Dumac, Judge Elfvin granted summary judgment against it.
 
 
 5
 Ciminelli would have us adopt a rule of equitable restitution that would allow employers to recover overpayments simply upon a showing of the mistake. Such a rule, however, is contrary to ERISA's plain terms. ERISA states in subsection (1) that "[e]xcept as provided in [subsection (2) ] the assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c) (1988). Any debate over whether a repayment of a mistaken contribution "inures" to an employer is settled by the fact that one of the exceptions in subsection (2) explicitly addresses the legality of such repayments. That exception permits plan administrators to return mistaken contributions "within 6 months after the plan administrator determines that the contribution was made" by mistake of fact or law. 29 U.S.C. § 1103(c)(2)(A)(ii) (1988). Because the proposed claim for equitable restitution would make repayments mandatory, it is at odds with ERISA. We cannot believe that Congress intended us to fashion a remedy so obviously at cross purposes with the empowering statute.
 
 
 6
 Most circuits that have addressed the question have held, on one theory or another, that a limited right to recover overpayments exists. See Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 993 (4th Cir.) (recoupment of overpayments to a plan participant on ground of unjust enrichment), cert. denied, --- U.S. ----, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990); Plucinski v. I.A.M. Nat'l Pension Fund, 875 F.2d 1052, 1056-58 (3d Cir.1989) (equitable restitution); Kwatcher v. Massachusetts Serv. Employees Pension Fund, 879 F.2d 957, 965-67 (1st Cir.1989) (same); Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund, 794 F.2d 221, 236 (6th Cir.) (restitution), cert. denied, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986). But see Dime Coal Co. v. Combs, 796 F.2d 394, 398-99 (11th Cir.1986) (no federal common law right to recovery of payment). As noted, we have also held that an employer is entitled to repayment if it shows that the refusal to repay was arbitrary or capricious and "the equities favor restitution." Dumac, 814 F.2d at 82-83 (quoting Award Serv., Inc. v. N. Cal. Retail Clerks, 763 F.2d 1066, 1069 (9th Cir.1985).[1] In determining the balance of equities, particular concern must be given to the effect on the financial stability of the fund. Id. at 83. In Dumac, a fund rule denying repayment of mistaken contributions made over three years before was challenged. We remanded because the fund had given inconsistent reasons during discovery for the three-year rule. Id. We see no reason to remand in the instant case.
 
 
 7
 Ciminelli made no attempt in discovery to probe the reasons for the funds' failure to repay the overpayments or to develop an affirmative case demonstrating arbitrariness or capriciousness. Its submission in support of its motion for summary judgment and in response to the cross-motion for summary judgment merely established the fact of overpayment. More was required for it to prevail.
 
 
 8
 Our review of the administrative decisions of pension and benefit funds is "limited," id. at 82, and particularly so in the context of a statute expressly leaving certain decisions to the funds' discretion. Congress evidently believed that the risk of mistaken contributions should rest largely with the employer. It had good reason for that conviction. Funds cannot easily determine whether a payment is mistaken, whereas employers have readily available and accurate information concerning factors such as the number of hours each employee worked in each pay period. Absent costly ongoing audits, funds must depend upon the employers' calculations. Moreover, the future incidence of claims for repayment of mistaken contributions are not easily predictable by individual funds, particularly small ones. Funds will thus find it difficult to set aside accurate reserves to cover future claims, and beneficiaries of the funds may be undercompensated as a result of conservative judgments as to such reserves. As stated, therefore, at least where there are no equities strongly favoring the employer, the risk of mistake should fall upon the employer.
 
 
 9
 Moreover, in determining the balance of equities, sleeping on one's rights is always a consideration. This is particularly so in the case of pension, benefit, and welfare funds. Time is important because a fund generally must be able to rely upon its current calculation of total assets. For example, when a particular employee retires under a pension plan providing fixed benefits, the fund must calculate the level of benefits the employee has earned and must generally commit sufficient assets, e.g., purchase an annuity, to guarantee that the employee will receive the determined level of benefits. Both the determined level of benefits and the amount committed must be derived from the current calculation of the fund's total assets. If employers are allowed to recover overpayments and thereby reduce a fund's total assets, those who have already retired will have received too much because their benefits were calculated as a share of an inflated calculation of total assets. Future retirees will then receive too little. Although the repayments may not render a fund unstable, the loss of benefits may seem substantial to pensioners for whom even small sums are important. No doubt plans can provide that levels of benefits to particular retirees will be revised downward as necessary to refund mistaken contributions, but this loss of certainty among pensioners may not be worth the gain from correcting temporally remote overpayments by employers.
 
 
 10
 Other kinds of benefit plans also have a need to rely upon their books. Medical benefit plans, for instance, commit to certain levels of benefits based on such reliance. Moreover, payments of stale claims for restitution may make it more difficult for future timely employer claimants to recoup mistaken contributions. The lapse of time between the mistaken contributions and their discovery by the employer and the request for repayment, and the lapse of time between those events and the employer's lawsuit, are, therefore, important factors in balancing the equities.
 
 
 11
 Ciminelli's claim fails. Ciminelli made no attempt to meet the Dumac requirement that employers seeking repayment of mistaken contributions show a balance of equities in their favor. Notably, by restricting its submission on the cross-motions for summary judgment to a demonstration that it had made a mistake, Ciminelli made no showing of the effect of repayment on the funds as a whole or upon individual beneficiaries of those funds. In addition, the lapse of time since the mistaken contributions weighs heavily against Ciminelli. Some of the contributions were six years old when discovered after November 1986. Ciminelli then waited until December 1990 to bring the instant action, over two and one-half years after the six-month period during which repayments are permitted had expired.[2] The last overpayment, in November 1986, is, at the time of this opinion, coming up on its sixth birthday. The first overpayment, in June 1981, was eleven years ago. The delay is egregious, and, except for the time consumed by the audit, which is not determinable on the record before us but was less than one year, attributable to Ciminelli. Ciminelli now asks for a remand to build the record that it had ample opportunity to do before. Given the delay, a remand would inevitably result in an adverse ruling and is thus fruitless.
 
 
 12
 Finally, we reject Ciminelli's argument that because the funds' brief in the district court in support of the cross-motion for summary judgment relied solely upon the argument that employers have no standing to sue under ERISA, see supra note 1, Ciminelli was not obliged to offer evidence regarding the balance of equities. However, responding to the funds' standing argument, Ciminelli's reply brief specifically relied upon Dumac, and the district court expressly derived the requirement of a showing of equities favoring restitution from that very decision. A party's surprise that a court relied upon a case it cited is not an ambush redressable on appeal.
 
 
 13
 Affirmed.
 
 
 
 [1]
 Although the facts in the two cases are entirely different, there is some tension between Dumac and Tuvia Convalescent Center, Inc. v. National Union of Hosp. & Health Care Employees, 717 F.2d 726 (2d Cir.1983). Tuvia broadly held that employers have no standing to sue under ERISA even if they have been directly injured and the injuries are within the class of interests that ERISA was intended to protect. Id. at 730. Dumac of course permits suits by employers for the return of overpayments
 
 
 [2]
 Whether an action under Dumac must be brought within the six-month period as a result of the prohibition on repayments thereafter need not be addressed