John P. NOVAK, Plaintiff,

v.

TRW, INC., et al., Defendants.

No. CV 92–0173.

United States District Court,
E.D. New York.

June 2, 1993.

James Dolan, Garden City, NY, for plaintiff.

Deborah P. Warner, Thompson, Hine & Flory by Joel R. Hlavaty, Cleveland, OH, Lester, Schwab, Katz & Dwyer by Saul Wilensky, New York City, for defendants TRW,

Inc., TRW Title Insurance of New York, Inc. and Aetna Life Ins. Co.

Andrews & Kurty by Lynne M. Fishman, New York City, for defendant TX Commerce Bank, Trustee of the TRW Employee Welfare Benefits Plan Trust.

WEXLER, District Judge.

John Novak ("Novak"), plaintiff in the above-referenced action, seeks relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for the allegedly wrongful termination of his employment and the allegedly wrongful denial of up to $2,000,000 of medical benefits to his son. Plaintiff seeks, *inter alia,* reinstatement of his job, back pay, reinstatement of medical benefits, and related compensatory and punitive damages. TRW Title Insurance of New York ("TRW Title"), plaintiff's former employer, and TRW, Inc., the Administrator of TRW Title's employee welfare benefit plan ("defendants"), have filed a counterclaim, seeking reimbursement of medical benefits paid to plaintiff to the extent that plaintiff has or will receive such money from third parties. Now before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on plaintiff's claim. Also before the Court is plaintiff's motion for summary judgment and for Rule 11 sanctions on defendants' counterclaim. For the reasons stated below, defendants' motion for summary judgment is granted in part and denied in part; plaintiff's motion for summary judgment is granted in part and denied in part and its motion for Rule 11 sanctions is denied.

## I. BACKGROUND

In 1984, Jonathan Novak, ("Jonathan") plaintiff's then two year old son, was the victim of a near drowning accident in a swimming pool. Jonathan sustained severe, permanent brain damage; his mental status today is that of a coma victim. He does not speak and it is uncertain whether he has any sight. Plaintiff contends that in order to avoid permanent hospitalization, Jonathan requires twenty-four hour skilled nursing care at home.[1] *See* Affidavit of Jonathan's treating physician, Dr. Robert D. Semlear.

On March 5, 1991, plaintiff, as guardian of his son's property, settled Jonathan's personal injury claims related to his accident against four parties. Under the terms of the settlement agreement, Jonathan will receive a total of $1,200,000 for his pain and suffering. The settlement agreement does not include any allocation for Jonathan's medical expenses.

Plaintiff did not inform TRW Title of the existence of the settlement. However, TRW Title's local attorney, Lester, Schwab, Katz & Dwyer, represented one of the defendants in that suit and therefore was fully aware of the terms of the settlement agreement.

Prior to October 27, 1989, plaintiff was employed by Title USA Insurance Corporation of New York ("Title USA") as underwriting counsel in Riverhead, New York. On October 27, 1989, Title USA was acquired by TRW Title through a stock purchase. Title USA was renamed TRW Title Insurance of New York and plaintiff continued working in the same Riverhead office for TRW Title as underwriting counsel. In July 1990, TRW Title renewed its Riverhead lease for a five-year term.

In the summer of 1991, TRW Title began a large-scale reorganization, which resulted in the closing of several offices and the laying off, transferring or relocating of numerous employees. In July 1991, TRW Title instructed plaintiff to lay off his secretary and to find new office space in a Riverhead law office. Plaintiff did so. However, in October 1991, when Novak was the only TRW Title employee remaining in the Riverhead office, he was orally notified that the office would soon be closed, and that TRW Title was transferring him to its Melville office.

Novak, who lives in Sag Harbor, New York, would not commit himself to accepting this transfer as it would increase his daily commute by nearly one hundred miles. Subsequently, in a letter faxed to Novak on November 8, 1991, TRW Title offered him an

---

1. Defendant's expert witness, however, Dr. Owen P. Kieran, has testified that Jonathan can be cared for at home without skilled nursing care. *See* Affidavit of Dr. Owen P. Kieran.

additional $150 per month as an automobile expense allowance if he would accept the Melville transfer. The letter also informed him that if he failed to report to the Melville office on November 12, 1991, he would be laid off. Plaintiff did not show up for work at the Melville office on the specified date, and on or about November 14, 1991, he was terminated.[2]

At that time, plaintiff had the option to elect continuation of his health insurance coverage for eighteen months pursuant to the provisions in TRW Title's health plan and the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). He asserts that he did not do so because he was not given statutory notice of his right to continue such coverage until September 1992.[3] Defendants, however, have supplied an affidavit of Kathy Clark, an employee in its Human Resources–Benefits Administration Department, and a computer print out of its business records, showing that a COBRA notice was mailed to plaintiff on or about December 11, 1991, within thirty days of Novak's termination as provided by statute. Moreover, the Court notes that even after plaintiff received a "second" notice in September 1992, he did not seek to extend his health insurance coverage.[4]

While plaintiff was an employee of Title USA of New York, he was provided health care benefits by Title USA Corporation (Delaware) Health Plan[5] ("USA Health Plan") which had a $1,000,000 cap for non-occupational injuries. The USA Health Plan became inactive in October 1989; it was terminated in 1990; and the sponsor of the plan, Title USA Corporation (Delaware), ceased to exist on March 1, 1991.

From October 27, 1989 (when TRW Title took over Title USA) to January 31, 1990, plaintiff was covered by a health plan established by TRW Real Estate Loan Services, Inc. ("RELS") a subsidiary of TRW, Inc. that is not a party to this action. The funds for these interim payments were apparently provided by TRW, Inc.

On February 1, 1990, TRW Title instituted the ChoicePlus plan, a self-insuring arrangement with a $2,000,000 cap, established to replace the USA Health Plan. By that time, plaintiff had received approximately $825,000 in payments under the interim plan, the USA Health Plan, and various predecessor plans.

In February 1990, TRW Title took the position that because plaintiff's son was in confinement at the time the ChoicePlus plan went into effect, medical expenses related to Jonathan's pre-existing condition would not be covered under the ChoicePlus plan. However, without informing plaintiff of its decision, TRW Title "voluntarily" committed itself to continue paying medical benefits to plaintiff for his son's injuries out of company funds until the $1,000,000 cap that had been provided by USA Health Plan was reached. Accordingly, TRW Title allocated $175,000 of company funds for the payment of plaintiff's claims.[6]

On February 7, 1991, TRW Title informed plaintiff that the $1,000,000 commitment was

---

2. Plaintiff contends that there was no necessity for his transfer because he conducted most of his business over the phone. Moreover, he notes that between March 11, 1991 and November 7, 1991, TRW Title had rejected a half dozen claims and appeals that he had submitted for Jonathan's medical expenses.

3. Although it was not an "official" notice, it is undisputed that the November 8, 1991 letter that plaintiff received from TRW Title informed plaintiff of his rights under COBRA.

4. Plaintiff complains that this notice was unsigned, incorrectly addressed, untimely, and improperly retroactive.

5. The Title USA health plan was provided by a Delaware corporation that was a sister corporation to Title USA Insurance Corporation of New York, plaintiff's employer.

6. TRW Title now contends that unbeknownst to them at the time, a Human Resources representative of TRW in California had established an interim health plan called the TRW/Title USA New York Benefit Plan to cover former employees of Title USA who became employees of TRW Title after the stock purchase. TRW Title now takes the position that due to this transitional plan, plaintiff's son *was* entitled to medical coverage under the ChoicePlus Plan, notwithstanding his confinement and pre-existing condition.

Plaintiff, on the other hand, contends that TRW Title's decision to "voluntarily" pay $175,000 in benefits was part of a long-term strategy to avoid paying $2 million in ChoicePlus benefits.

satisfied and his son's medical expenses would no longer be paid out of company funds, but that plaintiff could seek coverage under the ChoicePlus plan which provided a $2,000,000 cap. However, when plaintiff submitted his claims under the ChoicePlus plan for the period from January 1991 through August 1992, Aetna, the ChoicePlus administrator, rejected them, determining that they involved custodial and/or maintenance care, which were specifically excluded from coverage.

Custodial Care is defined in the Choice-Plus Plan as follows:

Custodial Care means care made up of services and supplies that provide a level of routine maintenance for the purpose of meeting personal needs. That is, care that can be provided by a lay person who does not have professional qualifications, skills or training.

Maintenance Care is defined as follows:

Maintenance Care is care made up of services and supplies furnished mainly to: Maintain, rather than improve, a level of physical or mental function, or Provide a protected environment free from exposures that can worsen the covered family member's physical or mental condition.

TRW's Administrative Committee concurred with Aetna, but in its discretion allowed payments for weekly visits by a registered nurse.[7] Moreover, because plaintiff had not elected continuation of his health insurance coverage under COBRA, the Administrative Committee only considered charges for services through May 1992, because the ChoicePlus plan automatically entitles employees to six months of coverage after termination from the company. Plaintiff made numerous appeals to the Administrative Committee regarding its denial of his medical benefits, all of which were denied.

Because plaintiff had not timely submitted Dr. Semlear's affidavit on the issue of custodial care to the Administrative Committee, this evidence was not considered in the Administrative Committee's original determinations. This Court directed that (1) Dr. Semlear's affidavit should be submitted to the Administrative Committee and considered by it; (2) Dr. Semlear could submit a supplemental affidavit for the Administrative Committee's consideration regarding the issue of whether Jonathan's medical care is "maintenance" as that term is defined in the Choice-Plus Plan; and (3) TRW should conduct its own medical examination of Jonathan for consideration by its Administrative Committee.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). All reasonable inferences and ambiguities are drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Thompson*, 896 F.2d at 720 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1961)) (per curiam).

A. *Defendants' Motion for Summary Judgment on Plaintiff's Wrongful Termination Claim*

1. Establishment of Prima Facie Case Under ERISA § 510

■ Plaintiff contends that he was wrongfully terminated when defendants closed its Riverhead office and transferred him to its Melville office. ERISA § 510 states that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is

---

7. Of the $266,116.94 in expenses submitted, TRW Title allowed $9,736.13, covering weekly visits by a registered nurse to monitor Jonathan's condition, doctors' bills, and prescriptions through May 1992.

entitled under the provisions of an employee benefit plan...." 29 U.S.C. § 1140. In order to sustain a § 510 claim, a plaintiff must establish a prima facie case of unlawful termination by showing that he: (1) belongs to a protected group; (2) was qualified for the position; and (3) was discharged or denied employment under circumstances that give rise to an inference of discrimination. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114–15 (2d Cir.1988). The nature of a plaintiff's burden of proof at the prima facie stage is *de minimis*. *Id.* at 1114. Applying this standard to the instant case, the Court finds that plaintiff makes out a prima facie case sufficient to withstand summary judgment.

■ It is undisputed that as an employee of TRW Title, plaintiff belonged to a protected group. Moreover, TRW's attempt to transfer plaintiff to the Melville office indicates that TRW Title found him qualified for his position as underwriting counsel. Finally, plaintiff's termination was simultaneous with his appeals for approximately $250,000 of medical benefits. These circumstances are sufficient to give rise to an inference of discrimination, thereby establishing plaintiff's prima facie case. *See Dister*, 859 F.2d at 1115 (employee's discharge four months and seven days before he qualified for pension benefits worth approximately $550,000 was sufficient to make out a prima facie case of discriminatory discharge in order to withstand summary judgment).

■ Once the plaintiff makes a prima facie showing of wrongful intent, the burden of production shifts, and the employer is required to articulate a legitimate, nondiscriminatory reason for the termination. *Dister*, 859 F.2d at 1115. Defendants in the instant case provide substantial evidence of a nondiscriminatory motive for plaintiff's discharge. It is uncontroverted that in the summer of 1991, TRW Title underwent a large-scale reorganization which resulted in the closing of offices and the transfers and layoffs of numerous employees. Indeed, other TRW Title employees were transferred or relocated much farther than plaintiff, and were likewise terminated if they chose not to accept these conditions. Moreover, TRW Title offered to pay plaintiff $150 a month to cover his increased commuting costs and TRW Title warned plaintiff orally and in writing that if he failed to report to the Melville office on November 12, 1991, he would be discharged. Accordingly, defendants have satisfied their burden of articulating a legitimate, nondiscriminatory reason for plaintiff's termination.

■ Once the defendant articulates a nondiscriminatory reason for the plaintiff's discharge, the plaintiff must show that the reasons advanced by the defendant are merely a pretext for discrimination. *Dister*, 859 F.2d at 1115. In the present case, plaintiff first asserts that there is no evidence to support defendants' claim that its Riverhead office was to be affected by TRW Title's reorganization. To the contrary, plaintiff notes that in July of 1990, defendants signed a five year lease for the Riverhead office, indicating their intent to keep that office open. Plaintiff further alleges that most of his work as underwriting counsel for TRW Title was performed on the telephone, so his physical presence in the Melville office was not required. Indeed, the TRW Title underwriting counsel who was transferred to the Melville office as a result of plaintiff's discharge was subsequently transferred to TRW Title's White Plains office soon after defendants' motion for summary judgment was served. Plaintiff suggests that this brief employment in the Melville office was for the sole purpose of the instant litigation.

Finally, plaintiff suggests that defendants' acts of (1) paying $175,000 in Jonathan's medical bills from a "secret," "voluntary" allocation; (2) denying that plaintiff's son was covered under ChoicePlus due to his pre-existing confinement; (3) compelling plaintiff to make an onerous and unnecessary transfer to Melville, and (4) denying medical payments under a theory of custodial and/or maintenance care exceptions can be interpreted as a coherent strategy to save TRW Title $1,825,000 in potential medical costs.

Plaintiff's arguments are not compelling. Nevertheless, under the stringent requirements of a motion for summary judgment, the Court finds that plaintiff has presented sufficient evidence to establish a genuine is-

sue of material fact as to whether defendants' alleged reason for discharging him was only a pretext for discrimination.

### 2. Exhaustion of Administrative Remedies

Defendants contend that even if plaintiff could establish a § 510 violation, they are still entitled to summary judgment because plaintiff has failed to exhaust his administrative remedies to appeal his termination. *See Kross v. Western Electric Co.*, 701 F.2d 1238, 1244 (7th Cir.1983); *Mason v. Continental Group, Inc.*, 763 F.2d 1219 (11th Cir.1985), *cert. denied,* 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986). Plaintiff, however, maintains that he was never informed of any such administrative remedies. He notes that defendants' letter dated November 8, 1991, which informed plaintiff of his transfer, potential discharge, and benefits upon discharge, made no mention of the right to appeal a company decision to terminate employment.

Furthermore, defendants have not furnished the Court with *any* evidence of their policy of providing for administrative remedies regarding terminations. Therefore, defendants clearly have not satisfied the Court as to whether plaintiff was informed of internal procedures to be taken before filing a claim under ERISA.

■ Finally, even if defendants could establish that they had internal procedures known to plaintiff by which he could have appealed his termination, some courts have held that exhaustion of administrative remedies is not a prerequisite for maintaining a claim under § 510 of ERISA. *See Lawford v. New York Life Ins. Co.,* 739 F.Supp. 906, 912 (S.D.N.Y.1990) (analyzing legislative history and rejecting the holdings in *Kross* and *Continental Group* on the ground that Congress did not intend exhaustion of administrative remedies to be a prerequisite to suit in termination cases); *Zipf v. American Telephone & Telegraph Co.*, 799 F.2d 889, 891–92 (3d Cir.1986) (same). This Court finds the reasoning in *Lawford* and *Zipf* to be persuasive.

Accordingly, defendants' motion for summary judgment on plaintiff's wrongful termination claim is denied.

### B. *Defendants' Motion for Summary Judgment on Plaintiff's Claim for Denial of Benefits*

Plaintiff seeks to recover medical benefits for Jonathan's nursing care that he believes were improperly denied by defendants under TRW Title's ChoicePlus Plan. Under ERISA § 502, a participant in an employee benefits plan is permitted to bring a civil action to recover benefits owed to him under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B).

### 1. The Nursing Services at Issue Are Neither Outpatient Private Nursing nor Covered Services under the Individual Case Management Program

■ The ChoicePlus Plan provides for maximum benefits, per person, of $25,000 for "outpatient private nursing." Defendants note that this is the only provision in the ChoicePlus Plan providing for payment of nursing care, and they contend that the home nursing services that Jonathan receives is therefore subject to this $25,000 maximum.

Plaintiff responds that under the plain meaning of "outpatient" Jonathan does not receive "outpatient private nursing" because he is not receiving medical services supplied by a hospital. *See, e.g.* 10 NYCRR Chapter V, Part 405, Hospitals–Minimum Standards (Volume C), § 405.20 (defining outpatient services as being hospital sponsored or hospital based). Moreover, plaintiff notes that the burden of proving that a claim falls within an exclusion of an insurance policy rests with the insurer, *Neuwirth v. Blue Cross*, 62 N.Y.2d 718, 476 N.Y.S.2d 814, 465 N.E.2d 353 (Ct.App.1984), and that ambiguous language in an insurance policy must be construed against the insurer. *Danzig v. Dikman,* 78 A.D.2d 303, 434 N.Y.S.2d 217 (1st Dep't 1980), *aff'd,* 53 N.Y.2d 926, 440 N.Y.S.2d 925, 423 N.E.2d 402 (1981). Under this standard, the Court agrees that the disputed nursing services should not be categorized as "outpatient private nursing."

Defendants contend that if the services at issue are not "outpatient private nursing" they are simply not covered by the plan. Plaintiff argues, however, that the nursing services must be construed as services defendants should provide as a less expensive alternative to hospitalization under its Individual Case Management Program.

Under the ChoicePlus Plan, the Individual Case Management Program is a discretionary program in which the insurer and the insured agree to a means of alternative treatment that is not specifically provided for in the ChoicePlus Plan and it is only applicable when the alternative treatment has been approved in advance by the claims administrator. In the instant case, defendants and the claims administrator have never agreed to provide the nursing services at issue here. Accordingly, because Jonathan's nursing services are neither outpatient private nursing nor covered services under the Individual Case Management Program, plaintiff's claim for these nursing services must be dismissed.[8]

### 2. Exclusion for "custodial care" or "maintenance"

TRW Title's Administrative Committee concluded that the majority of plaintiff's claims were for custodial and/or maintenance care, and were therefore not expenses covered under the express terms of the plan. "Custodial care" is defined as "services and supplies that provide a level of routine maintenance for the purpose of meeting personal needs. This is, care that can be provided by a lay person who does not have professional qualifications, skills, or training."

Defendants submitted the statement of a registered nurse, who (based on Jonathan's nurse's notes) concluded that the care Jonathan receives appears to be custodial in nature. Plaintiff noted, however, that a qualified physician did not participate in the review, the nurse who made the conclusion did not visit Jonathan's home, and she did not consult Jonathan's health care providers in making her determination.

Plaintiff submitted the affidavit of Jonathan's treating physician, Dr. Semlear, to this Court. The affidavit states that the medical services provided to Jonathan could not be provided by a lay person who does not have professional qualifications, skills, or training. (Affidavit of Dr. Semlear, p. 3). However, this affidavit was not sent to Aetna or to the Administrative Committee when they originally denied plaintiff's claims and appeals.

There is a split in the circuits regarding the evidentiary scope of a district court's review of an administrator's benefit decisions, and the Second Circuit has not ruled on the issue. Some courts have held that the review of a plan administrator's decision must be limited to a review of the evidence before the administrator. *See Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1460 (10th Cir.1991); *Perry v. Simplicity Engineering, Div. of Lukens Gen., Indust., Inc.*, 900 F.2d 963, 967 (6th Cir.1990). However, in *Luby v. Teamsters Health, Welfare, and Pension Trust Funds*, 944 F.2d 1176, 1184 (3d Cir.1991), the Third Circuit held that a district court's review of an ERISA determination is not limited to the evidence before the administrator. *See also Moon v. American Home Assur. Co.*, 888 F.2d 86, 89 (11th Cir.1989).

In order to avoid this controversy, this Court directed defendants' Administrative Committee to consider Dr. Semlear's affidavit as well as a supplemental affidavit from Dr. Semlear regarding the issue of whether Jonathan's medical care is "maintenance." Furthermore, the Court directed defendants to conduct their own medical examination of Jonathan. The affidavits were submitted and considered, the required examination took place, and the Administrative Committee upheld its earlier denial of benefits. Thus, in its review of the Administrative Committee's latest determination, the Court will consider both Dr. Semlear's affidavit and supplemental affidavit, as well as the affidavit of defendants' expert, Dr. Kieran.

---

**8.** In the alternative, construing the language of the policy against the interests of the insurer, the Court finds that Jonathan is receiving "outpatient private nursing" and the $25,000 maximum is applicable.

■ A § 502 claim for wrongful denial of benefits must be "reviewed under a *de novo* standard unless the benefits plan gives the [plan] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case an "abuse of discretion" standard of review is appropriate. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Heidgerd v. Olin Corp.,* 906 F.2d 903, 908 (2d Cir.1990) (where the language of the plan left no room for discretion as to whether benefits would be awarded, the *de novo* standard of review is mandated).

■ In the present case, the ChoicePlus Plan does not expressly grant discretionary power to the Administrative Committee to determine eligibility of claims. However, it is clearly within the discretion of the Administrative Committee to determine the eligibility of each claim on a case-by-case basis. Indeed, even though Aetna recommended that all of plaintiff's claims be rejected, the Administrative Committee, in its discretion, approved payment of weekly visits by a registered nurse. Under these facts, the Court believes that the "arbitrary and capricious" standard of review is appropriate. *See Seff v. NOITU Trust Fund,* 781 F.Supp. 1037, 1040 (S.D.N.Y.1992). However, the Court specifically notes that its findings would not differ were they made under a *de novo* review.

■ The Court finds sufficient evidence to satisfy plaintiff's burden of establishing genuine issues of material fact regarding whether the rejected claims covered expenses for custodial care.[9] However, plaintiff has failed to convince this Court that there is any credible evidence tending to establish that these claims are not for "maintenance care." "Maintenance care" is defined as "care made up of services and supplies furnished mainly to: [m]aintain, rather than improve, a level of physical or mental function, or [p]rovide a protected environment free from exposures that can worsen the covered family member's physical or mental condition." Although Dr. Semlear, in his supplemental affidavit, states that " 'maintenance care' is not a recognized term in the medical lexicon" and that "all the medical care that has been rendered to Jonathan ... is to improve his condition," this Court finds that "maintenance care" is clearly defined under the ChoicePlus Plan, and that plaintiff has not furnished the Court with any evidence tending to show that the services provided by Jonathan's nurses are in any way designed to improve his condition. Moreover, Dr. Kieran, after examining Jonathan and his nursing records, concluded that the nursing care he receives "is designed to maintain, rather than improve his level of physical and mental functions." Affidavit of Dr. Kieran.[10] Because the Court finds that there is no genuine issue of material fact as to whether the claims submitted by plaintiff are for maintenance care, defendants' motion for summary judgment as to plaintiff's claims for medical benefits is granted.[11]

9. Dr. Semlear states in his affidavit that Jonathan's medications "can only be administered by a physician or a registered nurse."

10. Although Dr. Semlear states in his affidavit that "Jonathan's condition has improved slightly over the past five years" he also notes that "it is impossible to predict whether this improvement will continue." Dr. Semlear never states that any improvement in Jonathan's condition was due to a specific course of treatment.

11. Defendants assert that in any event, because plaintiff failed to elect continuation coverage under COBRA, he was only eligible for coverage through May 1992. Plaintiff, responds that he did not apply for continuation coverage because he did not receive notice of this option within thirty days of his termination as required by the statute.

Defendants have supplied an affidavit demonstrating that notice was mailed to plaintiff on or about December 11, 1991, within the statutory period. Moreover, it is undisputed that defendants sent plaintiff a letter dated November 8, 1991 informing him of his right to elect continuation coverage under COBRA.

Furthermore, on or about September 3, 1992, after plaintiff informed TRW Title that he never received a COBRA notice, defendants sent him a letter stating that if he elected continuation coverage at that time, it would apply retroactively as of the date of his discharge. Plaintiff declined to elect continuation coverage. Accordingly, even if the Court were to find that plaintiff's claims were not excluded as "maintenance," his coverage would have ended as of May 1992, six months after his termination.

*C. Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim*

On March 5, 1991, plaintiff settled Jonathan's personal injury claims against four parties. Under the terms of that settlement agreement, Jonathan will receive a total of $1,200,000 for his pain and suffering, but nothing for medical costs. Plaintiff did not inform TRW Title of the existence of the settlement.

Defendants assert that they have a right to subrogation for the medical expenses paid by them and their predecessors in interest for which plaintiff's son has been or will be reimbursed by third parties. They contend that their right to subrogation cannot be destroyed by plaintiff's allocation of its settlement funds as wholly for pain and suffering. *See Dugan v. Nickla*, 763 F.Supp. 981, 984 (N.D.Ill.1991); (granting ERISA fund subrogation rights against portion of settlement purporting to be for pain and suffering); *cf. Ellis v. Kenworth Motor Truck Co.*, 466 F.Supp. 441, 443 (N.D.Texas 1979) (in workers' compensation case, insurer could reach damages recovered by an employee from a third-party tortfeasor for pain and suffering); *Aetna Cas. and Sur. Co. v. Jackowe*, 96 A.D.2d 37, 468 N.Y.S.2d 153, 159 (2d Dep't 1983) (settlement allocation purporting to be entirely for pain and suffering disregarded by court in determining insurer's right to subrogation).

Plaintiff, however, argues that the medical benefits paid to him were provided either by (1) the USA Health Plan, which no longer exists; (2) pursuant to a plan sponsored by RELS, TRW Title's wholly owned subsidiary, which is a non-party in this action; or (3) pursuant to a voluntary allocation made by TRW Title, for which it has no contractual right to recovery.

1. Defendants' claim for subrogation on the payments made pursuant to the USA Health Plan

When plaintiff worked for Title USA of New York (prior to October 27, 1989), he received approximately $820,000 in medical payments for Jonathan's care through the Title USA Corporation (Delaware) Health Plan and predecessor plans.[12] Defendants maintain that Title USA of New York's subrogation rights with respect to these payments were necessarily inherited by TRW Title when it purchased all the stock of Title USA of New York.

Plaintiff responds that although TRW Title purchased the stock of Title USA of New York, it did not purchase the stock of Title USA Corporation of Delaware, the sponsor of plaintiff's health plan. Moreover, the Title USA Corporation (Delaware) Health Plan became inactive in October 1989 and was terminated in 1990 and Title USA Corporation of Delaware ceased to exist by March 1, 1991. Therefore, plaintiff contends that neither defendants nor anyone else has any subrogation rights with respect to payments made pursuant to the Title USA Corporation (Delaware) Health Plan.

In response, defendants contend that the very fact that plaintiff was paid benefits by the Title USA Corporation (Delaware) Health Plan while he was employed by Title USA of New York shows that Title USA of New York "adopted" the Title USA Corporation (Delaware) Health Plan. Because TRW Title is the successor to Title USA of New York, defendants argue they have the right to recover any duplicate payments made by the Title USA Corporation (Delaware) Health Plan.

Defendants' argument is flawed. The only party that has subrogation rights related to the payment of insurance is the insurance company or fund that made the payments, not the insured's employer. *See generally, United States v. Aetna Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949). In the instant case, it is clear that TRW Title did not purchase the stock of the insurance company or fund that issued the Title USA Corporation (Delaware) Health Plan. Therefore, although the Court assumes that Title USA of New York "adopted" the Title USA Corporation (Delaware) Health Plan, there is no genuine issue of material fact regarding whether TRW Title assumed any rights of

---

12. Plaintiff notes that the Title USA Corporation (Delaware) Plan did not come into effect until February 1, 1988. Prior to that date, plaintiff was covered by other, unnamed health plans.

subrogation through its purchase of the stock of Title USA of New York. Defendants simply have not provided this Court with any evidence tending to show that Title USA of New York ever had any such subrogation rights. Accordingly, plaintiff's motion for summary judgment as to this claim is granted.

2. Defendants' claim for subrogation on payments made pursuant to the interim health plan

Defendants seek to recover medical payments made to plaintiff for Jonathan's care between October 27, 1989 and January 31, 1990 by a health plan sponsored by RELS. Plaintiff argues that TRW, Inc. and TRW Title have no right to subrogation for these payments and that RELS cannot assert the claim because it is not a party to this action. Furthermore, plaintiff asserts that these payments do not exceed $50,000, and therefore any claim for subrogation by RELS must be brought in state court.

Defendants respond that the money paid out by the RELS health plan ultimately came from TRW, Inc. Moreover, if the court deems RELS to be a necessary party on the counterclaim, its joinder can easily be effected.

Under Rule 13(a) of the Federal Rules of Civil Procedure, a "pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claims." Rule 13(h) states that persons other than those made parties to the original action may be made parties to the counterclaim in accordance with Rule 20. Under Rule 20(a), a party may be joined to an action if: (1) the right to relief of that party arises out of the same transaction, series of transactions, or occurrence; and (2) there are some common questions of law or fact presented. *Shaw v. Munford,* 526 F.Supp. 1209, 1213 (S.D.N.Y.1981). These requirements are satisfied in the present case.

Once the requirements of Rule 20(a) are satisfied, the Court must determine whether joinder "will comport with the principles of fundamental fairness." *Shaw,* 526 F.Supp. at 1213 (quoting *Desert Empire Bank v. Insurance Co. of North America,* 623 F.2d 1371, 1374 (9th Cir.1980)). Factors to be considered are whether joinder of the party will divest the Court of diversity jurisdiction, the delay of the movant in seeking to amend his pleadings, and the closeness of the relationship between the present parties and the parties to be joined. *Shaw,* 526 F.Supp. at 1215. In the present case, joinder of RELS will not destroy diversity jurisdiction. Moreover, defendants assert that they did not join RELS at the time that the counterclaim was filed because they did not believe that RELS was the real party in interest since TRW Title was the direct payer under this interim plan and the money ultimately came from TRW, Inc.

The joinder of RELS will not cause any delay in trial; at most, plaintiff will be required to conduct one or two additional depositions. Moreover, a compulsory counterclaim brought pursuant to Rule 13(a) does not need an independent basis of federal jurisdiction; the federal court has supplemental jurisdiction over compulsory counterclaims even though ordinarily it would be a matter for state court. *Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974).

Accordingly, because joinder pursuant to Rule 20(a) will not delay the proceedings or prejudice plaintiff, it will be permitted and plaintiff's motion for summary judgment as to this claim is denied.

3. Defendants' claim for subrogation on the payments made by TRW Title after January 1990

Defendants also seek to recover funds it expended for Jonathan's medical expenses after February 1, 1990. Plaintiff argues that defendants are not entitled to recovery of these funds because TRW Title voluntarily made the payments out of corporate funds.

Defendants respond that these payments were made pursuant to an informal, unwritten plan, the terms of which were supposedly

provided by · either the Title USA Health Plan or the ChoicePlus Plan. Defendants note that an ERISA action can be brought even when a formal ERISA plan is not adopted. *See, e.g., Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) ("a 'plan, fund, or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits"); *Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1503 (9th Cir.1985) (same).

In the instant case, however, unlike the cases relied upon by defendants, there is no writing which this Court can use to interpret the terms of TRW Title's "informal plan." Although both the USA Health Plan and the ChoicePlus Plan include a right to subrogation, there is no evidence to support defendants' contention that one of these subrogation clauses was impliedly a part of its informal plan. Under these facts, the Court finds that the payments in question were not made pursuant to an ERISA plan and defendants have no right to subrogation for their voluntary payments.

Alternatively, defendants assert that even if they do not have a right to reimbursement pursuant to an ERISA plan, they are entitled to recovery under a theory of unjust enrichment or equitable restitution because plaintiff should not be permitted to keep duplicate payments for the same injuries. Although ERISA does not explicitly provide for a statutory right of restitution, equitable relief has been applied in ERISA cases. *See Frank L. Ciminelli Const. Co., Inc. v. Buffalo Laborers Supplemental Unemployment Ben. Fund,* 976 F.2d 834, 836 (2d Cir.1992) (employer seeking repayment of mistaken overpayments must show a balance of equities in his favor); *Luby v. Teamsters Health, Welfare, and Pension Trust Funds,* 944 F.2d at 1186 (ERISA fund entitled to recovery for improper payment of death benefit under theory of ·equitable restitution); *Provident Life & Accident Insurance Company v. Wal-*

*ler,* 906 F.2d 985, 992 (4th Cir.1990) (recovery of overpayments to a plan participant on ground of unjust enrichment), *cert. denied,* 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524. Although this part of defendants' counterclaim is not based on an ERISA plan, there is no reason why the Court should not apply equitable principles to these facts.

Defendants set aside approximately $175,-000 of company funds in order to pay plaintiff's medical expenses. There is no evidence that plaintiff's claims were being paid contingent on reimbursement should plaintiff receive payment from third parties. Indeed, plaintiff was not even informed that the money was being paid out of separate company funds until after the payments ceased. Plaintiff could not and did not consent to this arrangement. Moreover, defendants do not claim that the payments have undermined their financial stability or the financial stability of any ERISA plan.

Finally, the lapse of time between the discovery of the settlement and defendants' counterclaim is an important factor in balancing the equities. *See Buffalo Laborers,* 976 F.2d at 836. It is undisputed that defendants' local counsel, Lester, Schwab, Katz & Dwyer, knew about the settlement of plaintiff's personal injury claim on March 5, 1991.[13] However, defendants did not file its counterclaim for subrogation until July 17, 1992, four months after Lester, Schwab, Katz & Dwyer appeared in this action.

On the other hand, this Court neither approves of double recoveries, nor does it approve of settlements in personal injury cases that purport to be for pain and suffering only. Finally, the Court does not approve of plaintiff's apparent failure to notify defendants about the terms of Jonathan's settlement.

Under these facts, the Court will reserve judgment as to plaintiff's equitable claims until trial. Accordingly, plaintiff's motion for

---

**13.** The relationship between attorney and client is that of principal and agent, *Burger v. Brookhaven Medical Arts· Bldg., Inc.,* 131 A.D.2d 622, 516 N.Y.S.2d 705, 707 (2d Dep't 1987), and the basic laws of agency dictate that an agent's knowledge is imputed to its principal. *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 507 (S.D.N.Y.1985). There is a presumption that an agent will relay to its principal *any* relevant information that he has acquired. *Id.*

summary judgment as to this part of defendants' counterclaim is also denied.

### D. *Plaintiff's Claim for Rule 11 Sanctions*

The Court does not find that defendants' counterclaim was frivolous or interposed for any improper purpose. Accordingly, plaintiff's motion for Rule 11 sanctions is denied.

### III. CONCLUSION

Accordingly, for the reasons stated above, defendants' motion for summary judgment is granted as to plaintiff's § 502 ERISA claim and denied as to plaintiff's § 510 ERISA claim. Plaintiff's motion for summary judgment is granted as to defendants' counterclaim for subrogation with respect to payments made by the Title USA Corporation (Delaware) Health Plan; it is denied as to the remainder of defendants' counterclaim. Plaintiff's motion for Rule 11 sanctions is denied.

SO ORDERED.