Nancy K. JORSTAD, Plaintiff,

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Defendant.**

Civ. A. No. 91–12042–WJS.

United States District Court, D. Massachusetts.

Feb. 14, 1994.

James D. O'Brien, Jr., O'Brien, Bernardin & Deren, Worcester, MA, for plaintiff.

Robert G. Baynes, Jr., Philip W. Riley, Law Offices of Philip J. McCarthy, Boston, MA, for defendant.

## MOTION OF DEFENDANT, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, FOR SUMMARY JUDGMENT (DOCKET ENTRY # 8)

BOWLER, United States Magistrate Judge.

On December 3, 1993, the parties executed a consent to proceed before this court for all further proceedings, including trial, pursuant to 28 U.S.C. § 636(c). (Docket Entry # 11). Also on December 3, 1993, defendant Connecticut General Life Insurance Company ("CG") filed a motion for summary judgment. (Docket Entry # 8). Plaintiff Nancy K. Jorstad ("plaintiff") opposes summary judgment. (Docket Entry ## 12 & 13). On January 11, 1994, this court held a hearing and took the motion (Docket Entry # 8) under advisement.

### BACKGROUND

Plaintiff originally filed her complaint requesting a jury in Massachusetts Superior Court. Thereafter, CG filed a timely notice removing this case to the United States District Court for the District of Massachusetts. (Docket Entry # 1).

Plaintiff's two count complaint seeks recovery for disability benefits under state law. She claims that CG improperly terminated her disability benefits in contravention of an employee welfare benefit plan for airplane flight attendants maintained by plaintiff's former employer, Eastern Air Lines, Inc. ("Eastern"). (Docket Entry ## 1 & 10, Ex. 1).

Count I alleges a breach of contract and Count II alleges a violation of Massachusetts General Laws chapter 93A ("chapter 93A"). (Docket Entry # 1). Plaintiff concedes, however, and this court agrees, that her com-

plaint is preempted by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA"). She also acknowledges that, in actuality, "she is bringing an action pursuant to ERISA's provisions in 29 U.S.C. § 1132(a)(1)(B) to recover benefits due to her under the terms of the plan, and to clarify her rights to future benefits under the terms of the plan." (Docket Entry # 12, p. 5). Consequently, under Rule 15(b), Fed.R.Civ. P., this court considers plaintiff's action as if plead under ERISA for a denial of benefits due under section 1132(a)(1)(B).

As a procedural matter affirmatively raised by CG, ERISA preempts the two counts in the complaint brought under state law to recover terminated disability benefits. See Nash v. Trustees of Boston University, 946 F.2d 960, 964 & n. 8 (1st Cir.1991); Wickman v. Northwestern National Insurance Company, 908 F.2d 1077, 1082 (1st Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990) (citing Pilot Life Insurance Company v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)); see, e.g., Cromwell v. Equicor–Equitable HCA Corporation, 944 F.2d 1272, 1276 (6th Cir.1991), cert. dismissed, —— U.S. ——, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992) (collecting cases wherein state claims for breach of contract, promissory estoppel, negligence and misrepresentation of benefits were preempted by ERISA); Best v. AGFA Compugraphic, 1992 WL 390713 at *1 (D.Mass. December 9, 1992) (cause of action, interpreted as one for improper claim settlement practices under chapter 93A, preempted by ERISA).

In addition, although the First Circuit has yet to address the right to a jury trial under ERISA, this court recognizes that "the majority of courts" examining the issue generally hold that "no right to a jury trial exists in ERISA actions." Berlo v. McCoy, 710 F.Supp. 873, 874 (D.N.H.1989) (plan participant's demand for jury stricken in action alleging breach of fiduciary duty); see, e.g., Turner v. Leesona Corporation, 673 F.Supp. 67, 70–71 (D.R.I.1987) (motion to strike jury demand allowed in action for benefits due

under long-term disability policy); Wilson v. Connecticut General Life Insurance Company, 670 F.Supp. 52, 53–54 (D.Me.1987) (suit for pension benefits under ERISA deemed equitable in nature; jury demand therefore stricken); Gucciardi v. Gencorp Inc., 1987 WL 30976 at *2 (D.Mass. December 10, 1987) (noting that plaintiff premised ERISA claim on breach of contract theory, court nevertheless characterized ERISA claim as equitable and struck jury demand); Strout v. GTE Products Corporation, 618 F.Supp. 444, 445–446 (D.Me.1985) (action to recover pension benefits under section 502(a)(1)(B) of ERISA was equitable; jury demand therefore stricken); see also Fuller v. Connecticut General Life Insurance Co., 733 F.Supp. 462, 463 (D.Mass.1990) (plan participant under ERISA not entitled to jury trial under section 1132(a)(1)(B)).

For purposes of summary judgment, this court finds the following facts.

On July 20, 1977, plaintiff, while working as a flight attendant for Eastern, was struck from behind by a meal cart and injured her back. At the time, she was a participant in the employee welfare benefit plan for flight attendants ("the plan") maintained by Eastern. (Docket Entry # 10, Ex. 1; Docket Entry # 13). CG issued the group policy to Eastern insuring benefit payments under the plan ("the policy"). Eastern employees received certificates of insurance explaining the benefits under the policy.[1] (Docket Entry # 10, Ex. 1, 2 & 4).

The policy provides disability benefits to employees who become disabled due to an accidental bodily injury "while insured under [the] policy." (Docket Entry # 10, Ex. 2, p. 12 & Ex. 4, p. 8B). The certificate of insurance ("the certificate"), which explains the benefits provided and tracks the language of the policy, reads as follows:

If sickness or accidental bodily injury disables an Employee so that he is completely prevented from performing the duties of his occupation or employment and if the disability continues after the Benefit Waiting Period shown in the

1. The policy provides that CG, as the insurance company, "will issue to [Eastern], for delivery to each insured Employee, an individual certificate which will summarize the essential features of the insurance coverage." (Docket Entry # 10, Ex. 4).

Schedule of Benefits, the Insurance Company will pay monthly income in an amount determined from the Schedule of Benefits. Such monthly income will be payable for the period during which the disability continues after the Benefit Waiting Period, but for no longer than 24 months....

If an Employee is so disabled that he is completed (sic) [2] prevented from engaging in *any occupation or employment* for which he is qualified, or may reasonably become qualified, based on his training, education or experience, and if monthly income has been payable for 24 months, the Insurance Company will continue monthly income payments during the period he remains so disabled.

(Docket Entry # 10, Ex. 2; emphasis added).

The benefit waiting period, as defined in the policy, commences when an employee becomes disabled and continues until the end of the period shown in the schedule of benefits, i.e., six months.[3] (Docket Entry # 10, Ex. 4). As indicated in the language of the certificate and the policy, in order to initially receive disability benefits for the first 24 month period after expiration of the six month waiting period, the employee must be prevented from engaging in her occupation, i.e., that of a flight attendant. After expiration of the initial 24 month period of disability, however, benefits are payable in the event an employee is completely prevented from engaging in *any* occupation or employment.

The certificate and the policy also provide an explanation of when insurance terminates. Under the heading, "Termination of Insurance," the certificate and the policy state that insurance "automatically terminate[s] on the earliest of" a number of dates, including "the date of termination of employment." (Docket Entry # 10, Ex. 2 & 4). Shortly thereafter, under the heading "Extension of Long Term Disability Benefits," the certificate and the policy provide as follows:

If disability for which Monthly Income is payable commences while this policy is in force, Monthly Income will be payable after termination of the policy to the same extent as if the policy had not terminated.

(Docket Entry # 10, Ex. 2 & 4).

Under the certificate and the policy, the claimant must provide the insurance company (CG) written notice of the claim. Upon receipt of written notice, CG would then furnish claim forms to the claimant or to the employer for delivery to the claimant. (Docket Entry # 10, Ex. 2 & 4).

Plaintiff applied and received disability benefits for the initial 24 month period. CG also paid plaintiff disability benefits "for a time thereafter," according to Byron L. Evans ("Evans"), formerly employed by CG as Regional Director of the Special Risk Operations Division in Dallas, Texas. Evans avers that he is personally familiar with plaintiff's disability claim. (Docket Entry # 10, Ex. 1).

After the July 1977 accident, plaintiff began an exercise program and wore a body brace covering her torso on a daily basis for "almost a year" in accordance with treatment prescribed by an orthopedic surgeon. (Docket Entry # 13). On or about December 22, 1977, plaintiff consulted Dr. Gerald Steinberg ("Dr. Steinberg") of the Department of Surgery of the University of Massachusetts Medical School Department of Orthopedic Surgery located in Worcester, Massachusetts.[4] (Docket Entry # 13 & 10, Ex. 4). At the time, x-rays showed an old compression fracture of the fourth vertebrae sustained from an injury in 1975. After determining that the July 1977 accident aggravated her prior condition, Dr. Steinberg placed plaintiff on anti-inflammatory medications and an exercise program. (Docket Entry # 10, Ex. 4; Docket Entry # 13).

---

2. Under the policy, this word correctly reads as "completely."

3. The certificate simply states the period as six months. (Docket Entry # 10, Ex. 2).

4. The above information is obtained, in part, from the August 5, 1981 letter from Dr. Steinberg to plaintiff's attorney. Presumably, Dr. Steinberg would testify consistent with the information he provided plaintiff's attorney in the *August 5, 1981 letter*. Accordingly, absent objection to this form of evidence within 15 days of the date of this Report and Recommendation, this court finds such evidence "would be admissible" within the meaning of Rule 56(c), Fed. R.Civ.P.

Despite the above measures, plaintiff's symptoms did not abate. On October 17, 1978, Dr. Steinberg admitted plaintiff to the University of Massachusetts Medical Center for further testing. Test results indicated a posterior protrusion of the fourth vertebral body, a slight narrowing of the dural space and mild radiculopathy [5] of the fifth vertebrae. Dr. Steinberg discharged plaintiff on October 21, 1978, and prescribed a body cast.

On November 14, 1978, plaintiff underwent back surgery. Plaintiff attests that Dr. Steinberg fused three vertebrae in her back and placed two Harrington distraction rods in her back to stabilize her spinal cord. As described by Dr. Steinberg, plaintiff received a spinal fusion from the third to the fifth vertebrae using Harrington distraction rods. (Docket Entry # 10, Ex. 4; Docket Entry # 13).

Plaintiff developed discomfort in her left leg four months after the surgery. She was hospitalized for additional tests from March 20 to April 2, 1979. A neurological examination proved "unremarkable." Electromyograms were normal and x-rays of the vertebrae indicated a "good" fusion. Plaintiff "got good relief" from an epidural block. (Docket Entry # 10, Ex. 4).

By letter dated May 20, 1981, addressed to an insurance company in North Quincy, Massachusetts, Dr. John L. Doherty, Jr. ("Dr. Doherty") stated that he examined plaintiff on January 24, 1980, and again on May 18, 1981.[6] He concluded that her condition remained unchanged and that she had "a permanent disability of about 30% of her spine and will never be able to work as an airline stewardess again or do any heavy type of work." (Docket Entry # 10, Ex. 4).

Dr. Steinberg saw plaintiff again on June 4, 1981. He described her condition as satisfactory with intermittent discomfort. He noted that she underwent a normal pregnancy and delivery. As of August 1981 Dr. Steinberg considered plaintiff "partially and permanently disabled." He further informed plaintiff's attorney that plaintiff could not return to heavy work or work involving the lifting of heavy objects. He stated that plaintiff would find it difficult to work in a job which involved repetitive bending or required remaining in a fixed posture. (Docket Entry # 10, Ex. 4).

By letter dated March 13, 1986, CG notified plaintiff that it had asked an independent vocational specialist to assess her vocational skills in order to evaluate her claim for long-term disability. CG further informed plaintiff that a representative from Crawford Risk Management Services ("Crawford") would contact plaintiff to arrange an appointment. (Docket Entry # 10, Ex. 4).

On April 4, 1986, Jodi A. Rufo ("Rufo"), a vocational consultant at Crawford, interviewed plaintiff in her home for approximately 30 minutes. (Docket Entry # 10, Ex. 4; Docket Entry # 13). Thereafter, Rufo prepared a detailed eight page report regarding plaintiff's medical condition and her ability to perform specific jobs which were available in the surrounding community ("Crawford report"). (Docket Entry # 10, Ex. 4).

Plaintiff attests that she and Rufo did not discuss her physical condition, pain or ability to perform certain tasks. (Docket Entry # 13). In the Crawford report, however, presumably prepared in the ordinary course of business (Docket Entry # 1), Rufo stated that subjectively plaintiff reported a constant, numbing pain in her left leg.[7] Rufo estimated that plaintiff could stand only for a 15 to 30 minute period. Rufo learned that, when driving, plaintiff could sit for an estimated 90 minute period before experiencing aching in her left leg. Rufo additionally noted that plaintiff had difficulty climbing stairs. (Docket Entry # 10, Ex. 4).

In addition to personally interviewing plaintiff, Rufo reviewed medical information provided by Dr. Steinberg, including three attending physician statements of continued

---

5. Radiculopathy is a disease of the roots of the spinal nerve. *Blakiston's Gould Medical Dictionary* (4th ed. 1979).

6. The record does not identify Dr. Doherty's specialty or field of practice.

7. This therefore creates a factual dispute, albeit not a material one.

disability, dated November 4 and 30, 1982, and October 29, 1984, and a September 4, 1980 letter.[8] Rufo further stated that she consulted the U.S. Department of Labor's Dictionary of Occupational Title and two occupational guides. Rufo then described plaintiff's medical condition and reiterated the contents of Dr. Steinberg's attending physician statements of continued disability.[9]

Thereafter, Rufo meticulously summarized plaintiff's work and educational history. She noted that plaintiff had certain aptitudes and occupational skills suitable for certain kinds of employment. Basing her determination on the medical reports and her personal interview, Rufo determined that plaintiff was capable of performing sedentary work and might be capable of performing light work involving alternate periods of sitting and standing. (Docket Entry # 10, Ex. 4).

Rufo concluded that plaintiff could perform three types of jobs, to wit, that of a receptionist, that of a data typist and that of an admissions evaluator. Rufo also contacted various business and universities and determined that such jobs were available in the surrounding community. (Docket Entry # 10, Ex. 4).

CG forwarded a copy of the Crawford report to Dr. Steinberg, asking his opinion as to whether plaintiff could perform the jobs noted therein. (Docket Entry # 10, Ex. 1). By letter dated September 4, 1986, Dr. Steinberg replied as follows:

I would considered (sic) [plaintiff] partially and permanently disabled. Specifically she cannot return to heavy work or work involving repetitive lifting of heavy objects. In addition, she would find it difficult to do repetitive bending or working in a stooped or fixed posture for any prolonged period.

I have reviewed the job descriptions that you forwarded recently. I do think [plaintiff] could perform these jobs with her current physical restrictions.

(Docket Entry # 10, Ex. 4).

By letter to plaintiff dated September 30, 1986, CG terminated plaintiff's benefits. Therein, CG specifically referred to the policy's provision for payment of benefits after two years if "your condition prevents you from engaging in any form of gainful employment." CG further informed plaintiff that she had experience in certain occupations identified by CG's "Health and Rehabilitation service." The letter, however, did not denominate the occupations. It nevertheless stated that plaintiff's attending physician, i.e., Dr. Steinberg, reviewed the occupations and "feels you are capable of performing the duties of these positions." It went on to note that, "in keeping with [Dr. Steinberg's] decision," CG was terminating plaintiff's benefits as of September 30, 1986.

The September 30, 1986 letter additionally advised plaintiff of the review process by enclosing forms outlining plaintiff's right to request a review of CG's termination under ERISA. In the letter, CG also offered "to review any additional information [plaintiff might] wish to submit, which, in your opinion, supports the fact that you continue to be disabled from the duties of any occupation as outlined by [the] policy." (Docket Entry # 10, Ex. 4).

---

8. Although this underlying material is not contained in the record, this court does not find it necessary to go outside the record as it existed before CG at and around the time CG terminated plaintiff's benefits in the fall of 1986. The content of the administrative record was sufficient at the time CG terminated plaintiff's benefits. While CG's misplacement of various items of the administrative record hampers this court's review, this court finds the material in the record sufficient for purposes of evaluating whether CG provided plaintiff a full and fair review of plaintiff's claim and acted correctly in terminating benefits in the fall of 1986.

When CG received a September 1988 letter from plaintiff's attorney approximately two years after CG terminated benefits, CG advised plaintiff's attorney that it could not locate plaintiff's claim file. CG then recreated the claim file and Evans avers that the copy of the claim file submitted to this court is a recreated file which truly and accurately reflects the contents of the original claim file. Plaintiff does not dispute the accuracy of Evan's recreation of the original claim file.

9. This court considers the findings of Dr. Steinberg contained in the Crawford report not for their truth but for the purpose of determining the basis of Rufo's findings and therefore the adequacy of CG's review and its decision to terminate benefits.

Evans avers that CG based its decision to terminate benefits on Dr. Steinberg's opinion and the finding that there were jobs available to plaintiff within her vocational and physical capacities. (Docket Entry # 10, Ex. 1). With the exception of Dr. Doherty's May 20, 1981 letter, the record indicates that CG relied on Dr. Steinberg's assessment of plaintiff's condition and did not obtain the opinion of any other physician.

■ Upon receipt of the September 30, 1986 letter, plaintiff retained and relied upon the services of an attorney. (Docket Entry # 13). By letter dated November 26, 1986, plaintiff's attorney made a formal demand for settlement pursuant to chapter 93A. The three page letter acknowledged that Dr. Steinberg treated plaintiff on a regular basis during the period from July 1977 "and continuing through the present." Although plaintiff's attorney opined that plaintiff cannot engage in any type of substantial or gainful employment, he failed to provide any new or additional medical information to support his assertion. He then asserted that the policy's shifting definition of disability was beyond the insured's expectation [10] and that CG terminated plaintiff's benefits "without adequate investigation and information." He requested that CG forward a copy of the Crawford report and "any and all vocational factors" considered by CG. (Docket Entry # 10, Ex. 4).

By letter dated December 19, 1986, CG provided plaintiff's attorney with a copy of the Crawford report and Dr. Steinberg's letter of September 4, 1986. CG's letter referred plaintiff's attorney to the pages in the Crawford report identifying the jobs plaintiff was deemed capable of performing. In the letter CG again advised plaintiff's attorney that he could submit to CG any additional information to support the argument that plaintiff was unable to be gainfully employed. (Docket Entry # 10, Ex. 4). Nevertheless, plaintiff's attorney did not submit any additional medical information to CG at that time.

Approximately two years thereafter, in September 1988, plaintiff's attorney submitted additional medical records from the University of Massachusetts to substantiate plaintiff's disability. The records primarily concern plaintiff's treatment with Dr. Randall R. Long ("Dr. Long"), Assistant Professor in the Department of Neurology at the University of Massachusetts Medical Center. Plaintiff's treatment with Dr. Long began in March 1988.

Hospital notes, see F.R.E. 803(4) & (6), signed by Dr. Steinberg reflect that plaintiff visited Dr. Steinberg on February 22, 1988, and that "we last saw [her] in August of 1986." She complained of pain in her lower back and left leg which had developed "about five weeks ago." In recording her medical history, Dr. Steinberg noted that plaintiff underwent an arthroscopy of her left knee "about a year ago" but that her knee was feeling better. After examining plaintiff and taking x-rays, Dr. Steinberg prescribed a physical therapy program and anti-inflammatory medication and ordered additional tests. (Docket Entry # 10, Ex. 4).

Thereafter, Dr. Steinberg referred plaintiff to Dr. Long who first saw plaintiff on March 15, 1988. After noting the November 1987 knee operation and conducting a physical examination, Dr. Long hypothesized that plaintiff might have changed her gait due to the knee operation which had lead to increased strain in the area of her prior back surgery. Dr. Long ordered a magnetic resonance image of plaintiff's lower spine in the area of the fifth vertebrae, a nonsteroidal, anti-inflammatory medication, an analgesic and a low dose tricyclic. Dr. Long saw plaintiff again on May 25, 1988, and noted that she was currently not taking medication and had received little benefit from the above prescribed medications.

By letter dated May 24, 1988, plaintiff's attorney informed CIGNA [11] that plaintiff

10. Federal substantive law governs the interpretation of an ERISA plan. *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 585 (1st Cir.1993). "Unlike the interpretation of ambiguous terms in insurance policies which uses the doctrine of *contra proferentum*, when interpreting severance pay plans in the ERISA context, we generally do not construe ambiguous terms against the drafter." *Id.* at 586 (citing *Allen v. Adage, Inc.*, 967 F.2d 695, 701 (1st Cir.1992)).

11. CG is a subsidiary of CIGNA.

had continued to receive treatment for injuries and therefore was entitled to benefits. Shortly thereafter, CIGNA advised plaintiff's attorney that he should contact Evans, who was responsible for the Eastern account and located in Dallas, Texas. (Docket Entry # 10, Ex. 4).

On September 15, 1988, plaintiff's attorney wrote to Evans and enclosed medical records from the University of Massachusetts Medical Center allegedly substantiating plaintiff's continued treatment for injuries causally related to her July 1977 accident. Evans avers that the medical records submitted to CG addressed plaintiff's condition after CG's 1986 termination of benefits and therefore presumably involved plaintiff's treatment with Dr. Long.

In February 1989 CG wrote to Dr. Long and, after explaining the policy's definition of disability, asked him whether in his opinion plaintiff was "totally disabled from all occupations." In reply, Dr. Long declined to offer an opinion concerning plaintiff's vocational abilities and noted that he initially saw plaintiff in March 1988. (Docket Entry # 10, Ex. 4).

By letter dated March 24, 1989, CG informed plaintiff's attorney that it had conducted another review of plaintiff's claim but had decided not to alter its previous decision to terminate plaintiff's benefits. The two page letter informed plaintiff's attorney of the basis for CG's termination of benefits in the fall of 1986. It explicated the policy's definition of "total disability" and pointed out that Dr. Long first saw plaintiff in March 1988. The letter further stated that Dr. Long advised CG that he could not comment on plaintiff's functional capacity as of December 1986. Consequently, CG advised plaintiff's attorney that the medical information relative to December 1986 indicated that plaintiff could have returned to work and that there were jobs available at that time which she could have performed. In addition, CG described the information it needed to alter its determination, i.e., information from doctors who treated plaintiff in or around December 1986. CG again offered plaintiff's attorney the opportunity to submit any additional medical information and stated that if plaintiff's attorney had additional questions about what information plaintiff needed to submit, he could contact CG's office. Finally, CG stated that the two year delay prejudiced its ability to investigate plaintiff's disability status as of December 1986. (Docket Entry # 10, Ex. 4).

Plaintiff filed suit in July 1991.

## DISCUSSION

CG moves for summary judgment. (Docket Entry # 28). Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Inferences are drawn in favor of plaintiff, the nonmoving party. *Space Master International, Inc. v. City of Worcester,* 940 F.2d 16 (1st Cir.1991); *Herbert W. Price v. General Motors Corporation,* 931 F.2d 162 (1st Cir.1991).

In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 41 (1st Cir. 1992) (citing *Anderson* ). "A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies,* 882 F.2d 993 (5th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Although CG need not produce evidence negating plaintiff's claims that there is a material issue in genuine dispute, *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1448 (D.Mass.1989), it must affirmatively show that there is an absence of evidence to support plaintiff's, the nonmoving party's, case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once CG carries its burden under Rule 56(c), plaintiff, as the nonmoving party, must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

■ It is undisputed that the plan in question is an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1). "Except in those cases where a different level of scrutiny is indicated in the benefit plan itself, the district court considers a denial-of-benefits challenge afresh, without deferring to the employer's interpretation of the plan." *Allen v. Adage, Inc.*, 967 F.2d 695, 697 (1st Cir.1992). Here, as in *Allen*, nothing in the plan indicates application of a more deferential standard. Nor does CG point to any provision in the policy or in the certificate of insurance which gives the plan administrator or the fiduciary discretionary authority to determine benefits.[12] *See Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 29 (1st Cir.1991) (court applied *de novo* standard inasmuch as employer failed to point out language in plan giving it discretionary authority).

Citing a Fifth Circuit case,[13] CG nevertheless contends that the *de novo* standard is inapplicable to cases, such as the instant dispute, which involve claim denials based on fact determinations rather than interpretations of terms within a plan. (Docket Entry # 9). Courts are split on this issue. *See Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1182 n. 5 (3rd Cir.1991) (collecting cases). In *Petrilli v. Drechsel*, 910 F.2d 1441, 1446 (7th Cir. 1990), the Seventh Circuit characterized this argument as "plausible" but declined to address it. More importantly, albeit in *dicta*, the *Petrilli* court persuasively pointed out that the recitation of the holding in *Firestone* "strongly suggests that the Court intended *de novo* review to be mandatory where administrators were not granted discretion, regardless of whether the denials under review were based on plan interpretations." *Id.* 910 F.2d at 1446; *see also Donaldson v. Metropolitan Life Insurance Company*, 812 F.Supp. 103, 105 n. 5 (E.D.Mich.1993) (adopting *de novo* review for fact determination and citing *Pierre*). In *Ring v. Confederation Life Insurance Company*, 751 F.Supp. 296 (D.Mass.1990), the court made no such distinction in applying a *de novo* standard to the employer's decision to terminate the plaintiff's disability benefits on the grounds that she could perform certain work and was therefore no longer totally disabled. This court will therefore review CG's decision to terminate benefits *de novo*.[14]

■ As a preliminary matter, the parties disagree as to the content of the record which this court may review under ERISA. CG argues that this court should limit its review to the documents and material before CG at the time it terminated plaintiff's disability benefits in the fall of 1986. (Docket Entry # 9). Plaintiff, however, urges this court to consider additional medical records and, in particular, the medical records of Dr.

12. Neither party identifies the exact role of CG in the plan and whether CG was an administrator and/or fiduciary under the terms of the plan. ERISA regulations permit an insurance company, licensed under state law, to process claims made under an ERISA plan. *See Motley v. Metropolitan Life Insurance Company*, 834 F.Supp. 1272, 1279 (D.Kan.1993).

Under the terms of the policy, "[n]o change ... will be valid unless approved by [CG]." (Docket Entry # 10, Ex. 4). CG also administered the process of approving or denying disability claims. Forms were submitted to and provided by CG. Accordingly, there is no indication that CG is not the proper party defendant in this ERISA action. *See Law v. Ernst & Young*, 956 F.2d 364, 372–373 (1st Cir.1992); *Daniel v. Eaton Corporation*, 839 F.2d 263, 266 (6th Cir.), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988) (discussing proper party/defendant); *Strzelecki v. Schwarz Paper Company*, 824 F.Supp. 821, 828 (N.D.Ill.1993) (same); *St. Mary Medical Center v. Cristiano*, 724 F.Supp. 732, 741 (C.D.Cal.1989) (same); *McKinnon v. Blue Cross–Blue Shield of Alabama*, 691 F.Supp. 1314, 1319 (N.D.Ala.1988), *affm'd*, 874 F.2d 820 (11th Cir.1989) (same); *Holland v. Bank of America*, 673 F.Supp. 1511, 1518 (S.D.Cal.1987) (same). More importantly, CG makes no argument that it is not the proper party. This court will therefore assume, for purposes of this motion, that CG is the proper party/defendant in this action under ERISA.

13. *Pierre v. Connecticut General Life Insurance Company*, 932 F.2d 1552 (5th Cir.), *cert. den.*, —— U.S. ——, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991).

14. Inasmuch as this court finds *infra* that CG's review was sufficient under the *de novo* standard, it is therefore also sufficient under the more deferential standard.

Long, the neurologist who initially saw plaintiff in March 1988. (Docket Entry # 12).

Plaintiff submits two "equitable arguments" in favor of going outside the administrative record which was before CG at the time it terminated disability benefits. (Docket Entry # 12). First, plaintiff avers that, upon notice of CG's termination of benefits in September 1986, she immediately contacted an attorney who represented that he would pursue her claim. The attorney never advised plaintiff that she should obtain additional medical opinions to document her permanent disability. Plaintiff attests that she relied on the attorney to properly handle her case. (Docket Entry ## 12 & 13). Second, citing two cases, she simply notes that her situation is the type of circumstance in which courts will review evidence outside the plan administrator's case file. (Docket Entry # 12).

Courts are split as to whether to consider evidence in addition to that presented to the plan administrator. The First Circuit has not yet spoken on whether a court should confine itself to reviewing the record as it existed before the plan administrator. Nor has the Second Circuit, *see Novak v. TRW, Inc.*, 822 F.Supp. 963, 970 (E.D.N.Y.1993); *see also Masella v. Blue Cross & Blue Shield of Connecticut*, 936 F.2d 98, 104 (2d Cir.1991) (finding it unnecessary to resolve issue), or the Eighth Circuit, *Davidson v. Prudential Insurance Company of America*, 953 F.2d 1093, 1095 (8th Cir.1992), squarely addressed this issue.

A number of other circuit courts hold that a court "may consider only the evidence available to the administrator at the time the final decision was made." *Miller v. Metropolitan Life Insurance Company*, 925 F.2d 979, 986 (6th Cir.1991); *accord Sandoval v. Aetna Life Insurance & Casualty Insurance Company*, 967 F.2d 377, 380–381 (10th Cir. 1992) (in determining whether denial of benefits was arbitrary and capricious, district court considers "only the arguments and evidence before the administrator"); *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir.1990) (in *de novo* review, district court considers the record as it existed before administrator or fiduciary). Other courts, particularly in the context of a *de novo* review, permit a court to consider additional evidence. *See Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d at 1184–1185 (when conducting *de novo* review, court is not limited to evidence before administrator); *Moon v. American Home Assurance Company*, 888 F.2d 86, 89 (11th Cir.1989). Remanding a case to the plan administrator to consider the additional evidence or to further develop the record offers an alternative solution. *See Quesinberry v. Life Insurance Company of North America*, 987 F.2d 1017, 1025 n. 6 (4th Cir.1993) (recognizing availability of remand where necessary); *Wolfe v. J.C. Penney Company*, 710 F.2d 388, 394 (7th Cir.1983) (acknowledging that court should remand to plan administrator to consider additional evidence); *DePina v. General Dynamics Corporation*, 674 F.Supp. 46, 50 (D.Mass.1987) (noting in *dicta* under exhaustion doctrine that remand to plan administrator for further findings would be appropriate).

As noted by the Third Circuit, where the record is not sufficiently developed, as plaintiff alleges in the case at bar (Docket Entry # 12), a court should not limit itself to the record before the plan administrator. *Id.* at 1184–1185. Similarly, while the Fourth Circuit generally limits *de novo* review to the evidentiary record before the plan administrator, the circuit permits additional evidence in the event "exceptional circumstances" exist. *Quesinberry v. Life Insurance Company of North America*, 987 F.2d at 1026–1027. Exceptional circumstances noted in *Quesinberry* include when there is little or no evidentiary record and when there is additional evidence which the claimant could not have presented during the administrative process.[15] *Id.* at 1027.

---

15. This court finds this is not a situation in which CG failed to develop an adequate record in the fall of 1986 at the time it terminated benefits. The medical and vocational information before CG all pointed towards the fact that

plaintiff could perform certain jobs at that time and was therefore no longer prevented from engaging in any occupation under the terms of the policy. As previously stated, this court does not find that CG's recreation of the original file un-

This court finds that the better approach is to permit a court the discretion to accept additional medical information when conducting *de novo* review but not when conducting review under a more deferential standard. Limiting the administrative record to facts before the plan administrator is contrary to the concept of conducting an independent, *de novo* review. *Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d at 1184 (citing *Moon,* 888 F.2d at 89, and *Doe v. United States,* 821 F.2d 694, 697 (D.C.Cir. 1987)).

■ Notwithstanding this court's position, however, it is unnecessary to resolve the issue of whether to accept additional information because the information at issue is irrelevant to the adequacy of CG's review of plaintiff's claim and its decision to terminate benefits in 1986. As correctly argued by CG, the information submitted concerning treatment in 1988 is not germane to CG's decision that in the fall of 1986 plaintiff was no longer disabled as defined in the policy. Despite being advised of the opportunity to submit such information in the March 1989 letter, plaintiff has yet to submit any additional information pertaining to her disability status in the fall of 1986.[16] *See, e.g., Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992) (citing *Franklin v. Pitney Bowes, Inc.,* 919 F.2d 45, 47–48 (6th Cir.1990)).

To the extent plaintiff's condition changed thereafter, plaintiff fails to point to any language in the plan or to any construction of the terms therein which indicate that the plan provided benefits to a claimant who, after termination, again becomes disabled as a result of aggravating the original, disabling injury. To the contrary, the plan provides long-term disability benefits to claimants who become disabled "while insured under this policy." (Docket Entry # 10, Ex. 4). In 1988 when, for purposes of argument, plaintiff again became disabled, she was no longer insured under the policy.

■ With respect to plaintiff's "equitable" argument that she relied on her attorney to properly present her claim and, consequently, the record is insufficient and this court should consider the additional evidence, this court is unpersuaded. Although plaintiff avers that her attorney never informed her of the need to present additional evidence (Docket Entry # 13), the September 30, 1986 letter from CG expressly advised plaintiff of her opportunity to submit additional evidence to support her claim of a permanent disability. The letter reads as follows:

> Should you disagree with our decision, we will be glad to review any additional information you may wish to submit, which, in your opinion, supports the fact that you continue to be disabled from the duties of any occupation as outlined by your policy. The enclosed form outlines your right to request a review of your claim under [ERISA].

(Docket Entry # 10, Ex. 4).

■ Upon receipt of the letter, plaintiff retained the services of an attorney. An attorney ordinarily acts as his client's agent. *Montplaisir v. Leighton,* 875 F.2d 1, 6 (1st Cir.1989) ("ordinarily, an attorney is the client's 'agent' within the traditional legal import of that term"); *see Novak v. TRW, Inc.,* 822 F.Supp. at 974 n. 13 (ERISA action; relationship between attorney and client is that of principal and agent). In so doing, a client is generally bound by representations (or omissions) made by the attorney. *See I.C.C. v. Holmes Transportation, Inc.,* 983 F.2d 1122, 1129 (1st Cir.1993) (principal's consent to be bound by attorney/agent's conduct may be implied by showing actual or apparent authority). In addition, as implicitly noted in *Sandoval v. Aetna Life Insurance & Casualty Insurance Company,* 967 F.2d at 382, the fact that the claimant was represented by an attorney worked against finding that the plan administrator had any obligation "to rule out a claim not before it." In assessing the adequacy of the notice of denial

duly hampers this court's ability to review CG's termination decision.

16. Plaintiff's affidavit fails to focus on the critical time period, i.e., the fall of 1986 and her condition at that time. Nor does the affidavit provide additional medical information concerning this time period. Rather, plaintiff states, in the present tense, that she cannot stand for longer than 30 to 60 minutes without experiencing pain.

under ERISA in *DePina v. General Dynamics Corporation,* 674 F.Supp. at 50, the court rejected the argument that the presence of counsel would dictate a different result. This court therefore remains unpersuaded that the omissions of plaintiff's counsel provide an adequate or equitable reason to open the administrative record in this case.

Plaintiff's complaint also alleges that CG failed to provide any reason for its termination of benefits.[17] (Docket Entry # 1, ¶ 11). This court disagrees. Assuming, for purposes of argument, that CG is a proper party/defendant,[18] CG's duty is generally to afford plaintiff a reasonable opportunity for a full and fair review of its denial. 29 U.S.C. § 1133. ERISA regulations impose a duty on CG to provide plaintiff with written notice of its denial including: (1) the reason for the denial; (2) specific references to plan provisions; (3) a description of any additional material necessary to perfect a claim and an explanation why such material is necessary; and (4) information concerning the review process. 29 C.F.R. § 2560.503–1(f). Providing a claimant sparse or conclusory reasons for the denial of benefits and the procedural process of review is insufficient and fails to comport with section 1133. *McLean Hospital Corporation v. Lasher,* 819 F.Supp. 110, 119 (D.Mass.1993); *see also DePina v. General Dynamics Corporation,* 674 F.Supp. at 49–50. The fact that plaintiff had or did not have counsel is "immaterial to the obligations imposed onto [CG] under the law." *McLean Hospital Corporation v. Lasher,* 819 F.Supp. at 125 (discussing absence of compliance with ERISA regulations as to advising claimants of appeal rights with regard to exhaustion under ERISA).

In the case at bar, plaintiff's attorney received a copy of the Crawford report with reference to the pages containing the jobs plaintiff could perform. In addition, the September and December 1986 letters and the March 1989 letter informed plaintiff and/or plaintiff's attorney of the review process and the reason for terminating plaintiff's benefits,

i.e., that plaintiff was no longer prevented from engaging in any form of gainful employment. The September 1986 letter described the plan requirement that, after two years a claimant is no longer disabled if he can engage in any form of gainful employment. Similarly, the March 1989 letter defined the meaning of disability as being unable to perform any occupation for which plaintiff is qualified. CG provided plaintiff's attorney with copies of the Crawford report and Dr. Steinberg's September 1986 letter commenting on plaintiff's ability to perform the positions identified in the report. The March 1989 letter explained that CG would need additional information relating to plaintiff's disability status and medical treatment in December 1986. Finally, the letters invited plaintiff and/or plaintiff's attorney to submit additional information and described such information, to wit, information showing that plaintiff cannot be gainfully employed in any occupation. The letters, taken together, *see Davidson v. Prudential Insurance Company of America,* 953 F.2d at 1096 (letters combined with telephone calls provided adequate notice as to reasons for denying claim, how to appeal and what information would be necessary), adequately show as a matter of law that CG complied with section 1133.

Plaintiff further urges this court to find a factual dispute regarding her disability status in 1986 based on her affidavit and the fact that she continues to receive treatment related to her July 1977 accident. (Docket Entry # 12). The Crawford report, dated May 15, 1986, concluded, in no uncertain terms, that plaintiff was "capable of performing many types of entry level clerical positions, which are sedentary and also offer flexible hours." Upon review of the jobs described in the Crawford report, Dr. Steinberg, who saw plaintiff on a regular basis, stated that, "I do think [plaintiff] could perform these jobs with her current physical restrictions." CG had no other evidence to indicate that plaintiff could not perform these

---

17. Neither party addressed this issue in the briefs. In light of the allegation in the complaint, this court will briefly address the issue inasmuch as plaintiff acknowledges that ERISA governs this action. (Docket Entry # 12, p. 5).

18. See footnote number 12.

jobs in the fall of 1986.[19] The September and December 1986 letters as well as the March 1989 letter all provided plaintiff and/or plaintiff's attorney the opportunity to submit additional information. The March 1989 letter specifically explained that CG would need additional information relating to plaintiff's disability status and her medical treatment in December 1986.

Finally, plaintiff has yet to submit additional information to establish a factual dispute that, in the fall of 1986, she was completely prevented from engaging in any type of employment. Plaintiff offers no additional medical information which existed in 1986 and which CG could or should have examined in 1986. Rather, the additional medical information concerned treatment plaintiff received in 1988 with reference to a November 1987 knee operation. Such evidence is not germane to CG's determination that plaintiff was no longer disabled in the fall of 1986.

The plan only provides coverage for long-term disability in the event a claimant is so disabled that she is "completely prevented from engaging in any occupation or employment for which [she] is qualified." As noted by a number of courts, a plan administrator has no obligation to manufacture evidence not before it. *Sandoval v. Aetna Life & Casualty Insurance Company*, 967 F.2d at 382; *see also Motley v. Metropolitan Life Insurance Company*, 834 F.Supp. at 1280 n. 12 ("[t]he claimant has an affirmative duty to present to the claims administrator any evidence she wants the administrator to consider"). There is no indication that CG's handling of plaintiff's claim was not even handed. "Money improperly paid out for uncovered claims reduces the amount of money available to pay valid claims." *Motley v. Metropolitan Life Insurance Company*, 834 F.Supp. at 1277–1278 n. 7. Having reviewed CG's termination *de novo*, this court finds that CG's decision to terminate benefits in the fall of 1986 was reasonable and appropriate as a matter of law.

## CONCLUSION

In accordance with the foregoing discussion, CG's motion for summary judgment (Docket Entry # 8) is **ALLOWED.** Counts I and II of the complaint are preempted under ERISA and, when construed as brought under ERISA, plaintiff's action cannot withstand summary judgment.

---

**19.** Plaintiff's after the fact affidavit speaks in terms of her present condition as opposed to her condition in the fall of 1986 when CG terminated her benefits.